Justices of the Ninth Circuit Court of Appeals and guests from another circuit. May it please the court, my name is Michael Flanagan. I represent Michael Chapman and James Tapley who are former union members of Local 302 of the Operating Engineers Union. That union, that local with Local 612 established a managed by a board of trustees here in Seattle. Under the rules of that plan, members of 302 could retire early earlier than regular retirement age 65 if they became of a certain age and they were vested. Both Mr. Chapman and Mr. Tapley qualified for early retirement and took early retirement. Under the plan, they could still work while drawing early retirement so long as they did not work in the same job classification that they worked in under covered employment, that is union employment, in the same industry and in the same geographical area. Mr. Tapley and Mr. Chapman asked the trustees, they direct most of the stuff through and then there's a board that handles appeals, so they they called up the management company and they said we'd like to know if we can work in these two fields, these are individual requests, and still draw early retirement. So Mr. Tapley said I want to be a flagman for the state of Alaska that does minor labor for the state, had to get a flaggers card, that sort of thing, brush cutting, fixing signs, things like that. Sort of a typical road crew, would you call it that? Yes, yes, and then Mr. Chapman said I'd like to drive a snowplow truck for the state of Alaska. The state of Alaska does not have 302 as a union. Both of these jobs came under the laborers union contract that state of Alaska has with the laborers union. Okay, so they applied, there was a little bit of evidence gathered, and they were told no, you can't do that. And they said well why? Because these are not the jobs we held before. The jobs we held before were as mechanics, heavy-duty mechanics. Mr. Tapley was a welder, station manager, which does a heavy-duty mechanic and oiler, which is somebody that services equipment out in the field. They appealed administratively, went to the Board of Trustees, and they both testified about their work experience with the union. In the case of Mr. Tapley, he told them the only time he'd ever been dispatched as an operator was one time, and it didn't work out, so he really never worked as an operator. He was a mechanic and an oiler. Let me ask you this, the new jobs that they have, have what are, at least for Alaska's purposes, they have classifications. So, Mr. Tapley, for example, may work as a flagger, but that's not the name of the classification of the job he's working in. It includes duties as a flagger, and it's got descriptions of what the person does in a 58 WG equipment operator classification. I got that. So, my question goes earlier. When they were working as covered employees, as members of the union, did their jobs have classifications as well as descriptions of what they actually did? Because you've given me descriptions of what they did. Did those jobs have union classifications? They did. They did. There is a master agreement. I don't have that right in front of me right now, but it's in the union contract that they've got these classifications. And it's part of the record because the trustees originally, as part of their decision, said, well, the job classification you have now, we believe, is a job classification that somebody in 302 could have done. Yeah, and Judge Holland said, oh, that's nonsense. But what I'm interested in is the smaller, as it were, subcategory, because, and I'm picking this up from Judge Holland's order, that there are subcategories of classifications among various people who are members of the union. Without necessarily making you give me the page number at the moment, can you tell me what classifications they had under the Collector Bargaining Agreement? They had mechanic. Was that the name of the classification? Yes, mechanic and oiler. They had those two classifications, exactly what these gentlemen were doing. So, their job description is the same as their quote, quote, classification. Yes. Okay. Yeah, and they had bulldozer, loader. Those are different classifications. And as far as Tapley is concerned, with the exception of that two-hour stint as a backhoe operator or whatever that was, his work history is entirely consistent with his claim that he was a skilled mechanic. Yes. Yes. And in terms of Mr. Chapman, just before we leave that area, they had some dispatches that said he was dispatched as an operator. He said that those dispatches are an error and he brought in letters from his employers on those dispatches that said he never worked for us as an operator. He was always a mechanic. And the union, rather than resolving the trustees, rather than resolving that factual issue, said even if everything he said is correct, we'd still disqualify him from pension benefits. So, the record as it came to the district court was that assuming all of his claims were true, he's still disqualified. May I ask you a more fundamental question? This agreement gives us, you know, is destined for litigation. I mean, you have an agreement that says you can't work in the same job classification with no definition whatsoever. And we have to decide whether or not the trustees in interpreting that were unreasonable or irrational or reached a conclusion contrary to some provision otherwise in the plan. That's correct. We're in agreement so far? Yes, Your Honor. Is it the process by which they do that that is the focus of our inquiry? No. Or the outcome? The outcome. Because you would agree that the process, at least on paper as they've expressed it, seems reasonable. They borrow from all these different sources. They look at the job descriptions. They look at the source material from the foreman and so forth and so on. They seem to be engaged in a process that makes sense. Well, not from a common layperson's standpoint it doesn't. I mean, is it... No. My position is, quite simply, I was a mechanic in my original job. Once I retired, I was, for all intents and purposes, a member of a road crew doing unskilled flagging, brush cutting, et cetera, et cetera. The two jobs are totally dissimilar. They couldn't possibly be in the same classification. Therefore, I should prevail. That's essentially your position. And that's supported by the standard of review that this court, the Ninth Circuit, has adopted in a number of cases we cited in our brief, which is that the plan language has to be construed in the ordinary and popular sense by people that people of average intelligence and experience would use. The trustees' decision was a result looking for facts to support it. That's why they took the master agreement and said, well, any job in the master agreement. And they also said in their own decision, these benefits were never meant to be given to people who have employment. That's what they said in their decision. This was a set of trustees who decided they didn't want to award benefits, and then they looked for a basis for doing it. But this court doesn't uphold decisions like that on that basis. What it does is it looks at the plan language. And if there's a clear conflict between the decision and the plain language of the plan, that's an abuse of discretion. And this court has said that in the Johnson and the Brown cases that are in my brief, an imposition of a standard that's not required by the plan is unwarranted and arbitrary. And that's an abuse of discretion. And that's what they did here, too. And that this court has basically already decided this issue, although not controlling, in the Smith versus CMTA case. That's a 1981 case that's cited in our brief. It was decided on a motion to dismiss, so it's not controlling. It never got to the merits. But the Minnesota cases that we cited, the district court cited Smith. They said, our decision is based on Smith. We've decided that that is a well-reasoned decision. We're going to apply it. And what the court said in that on the district level was, a trade or craft must be something narrower than all generally applicable skills one might learn in a particular occupation. And they gave an example that if you learn to juggle telephone lines, then you cannot take any job where you answer the phone. And that only a broad range of skills would prevent an employee that using a broad range of skills would prevent an employee from accepting any job in the same industry. It would be synonymous with just changing job classification industry. Well, then the Eighth Circuit Court of Appeals affirmed that decision. And that was a much closer set of facts. That was a set of facts where they had a butcher that became a wholesale baker. And they said, well, they're both putting products on the shelf, so therefore, it must be similar duties. I mean, that's the kind of stuff we're having. That's exactly what's happening in this case, is that... That's the good case for you. What about the bad case for you? We don't want to talk about Wildebar? Well, in that particular case, the language is totally different. They had extremely broad language that said any skills that you learned in your craft. And so the guy was a sheet metal worker, and now he's working for a company that's welding props together, boat props. And they said, well, you learned welding in our occupation, so therefore, you can't do that. But that was totally different language. It didn't say job classification. It said any skills that you picked up or utilized in covered employment. So the Eisenrich case is much closer, in fact, very, very similar to the facts of this case. And it relied on Smith, which is what this court already decided. But I can't get rid of Wildebar quite so quickly, in that Wildebar... I take what you said. I understand that. But the skills that he used that were in a new job were about 2% of what he did. It was basically repairing cavitation plates and skegs. I mean, so tiny, tiny bit of overlap. That was nonetheless enough for them. And I understand we're talking about skills and so on. But as we're trying to figure out what job classification means when we have no definition for job classification, maybe job classification really does talk about, well, what are the skills that you use? So can you help me out there? Yeah. That would be a reasonable approach if these are skills that are learned in the trade. So like if Mr. Chapman or Mr. Tapley had learned how to repair heavy equipment and the state of Alaska calls that job maintenance rather than mechanic, then that'd be the same job classification because they're basically utilizing the same skills. But what we don't want to do is conflate what they did in this case, conflate checking your oil and your gas and your tires and your light to being a mechanic. Every single one of us does that. Every 16-year-old that's allowed to drive a car is required by careful parents to do that. So that can't possibly be the job classification. But that's what they did here. They said, well, if you drive a car, that means anybody that drives any kind of vehicle for any employer where the employer says you've got to check your fuel and your gas and your lights, he can't have that job. That's ridiculous. That's the telephone example that's in the Eisenrich case. I mean, it's taking a small duty. I suppose he put his work clothes on. Does that mean if he puts his work clothes on, somebody tells him he can't have that job? Got it. Let's hear from the other side. Before you sit down, could I ask you to quickly address the motion to compel? What was the discovery and the purpose of the discovery that you wanted to take? Thank you for reminding me here, Honor. Before we'd done our briefing, just before we'd done our briefing, we found out that the trust had given union benefits, early retirement benefits, to somebody who was driving a fuel truck in Alaska. And he had been a mechanic. And they found this out through the grapevine, my clients. And so we asked the court, well, first of all, we asked the trust, would you please give us the details of how this guy gets the benefits and we don't? And they said, no, we're not going to tell you anything. So we asked the district court, would you please make them tell us that? Because this looks like a disparate handling of claims. And it goes to the, it's not the merits, it's not to the merits, but it's whether or not they're being reasonable and whether being abusive discretion or whether they're biased in favor of one claimant over the other. And the court decided that it wasn't going to let us have that information. Basically based on the case law that says you can't bring in new evidence after the administrative record. But there's an exception in this circuit for if you're challenging the decision making, the way they go around making decisions, whether they're biased, whether they decide the decisions disparately from one to the other. There's an exception for that. Montezulo cited Quinsbury and that's one of the exceptions in Quinsbury. So that's what that's about, Your Honor. And we only need to get to that point if the court doesn't uphold our position. That's fine. That's what I wanted to know. Good morning. I'm Catherine Rothwell and I'm the attorney for the Operating Engineer's Retirement Plan. And I would like to clarify that it is the retirement plan that is the party in this case. It's not the union. The retirement plan is a joint labor management board of trustees administered by ERISA. The district court in this case determined that the trustees did not abuse their discretion in applying a skills and duties test in interpreting the term job classification. And this court reviews the decision of the district court on a de novo basis, which in effect means that you review whether the board of trustees operated under an abuse of discretion or committed an abuse of discretion. And there's no dispute as to that standard of review. That means that you review the trustee's decision for reasonableness. And the issue is not whether the trustee's decision is more persuasive or the plaintiff's decision is more persuasive. As long as there was a reasonable basis for the trustee's decision, then it should be upheld by the court. There's policy reasons as well for deferring to the board of trustees. The board of trustees is familiar with the practices and the operations and the purpose of the retirement plan. And so they're in a position to interpret the terms of the plan in a uniform and non-arbitrary basis. In addition, the trustees come... That's why you were so anxious to have this late decision kept out? You're just talking about uniformity of decision. Your Honor, I would like to point out that they were familiar with the Champaign case well before the hearing for Mr. Chapman, which was the first hearing in this case. The record shows that Mr. Flanagan filed a pre-hearing brief in this case in December. The hearing was held in March. He filed a pre-hearing brief and to that he attached a statement from Mr. Chapman referring to Mr. Champaign. So it was not newly discovered evidence. Also under the abuse of discretion standard, they're not entitled to open up the hearing record. The hearing record is what forms the decision for the court in its review. Its review is limited to that. Okay. In this case, the purpose of the retirement plan is to provide retirement benefits. The purpose of the plan is to not provide supplemental income so that someone can retire at a very generous retirement age of age 52. But is the standard that governs payment for overlapping jobs the same for early retirement people and regular age retirement people in this plan or this plan? In this plan, it is the same. So in other words, we should interpret the language in the same way we would interpret it for someone who retired at the regular age. Yes. I was under the impression the plan said nothing about early retirees. You mean in the suspension rule, Your Honor? Exactly. The suspension of benefits rule in the plan does not distinguish between someone that is of normal retirement age and someone that is of early retirement age. Isn't it couched in terms of normal retirement? In other words, leaving to the ether what we do with early retirees? Or am I mistaken? The plan language itself does not distinguish that. ERISA and the regulations do provide a distinction and basically indicate that benefits become non-forfeitable at normal retirement age. And so they provide an exception, which is the suspension of benefits for someone who is normal retirement age. The courts and the Department of Labor have interpreted that to mean that the trustees are basically free to apply a different rule for someone who is early retirement age. In this case, the language is the same for both the early retiree and the normal retiree. So your argument that we should treat this differently because it's early retirement really is not a good argument. I don't believe we're arguing that this is a different case. Well, I thought I heard you make that argument. But okay, that's not an argument. Correct. Correct. Although you could, certainly. I mean, under the law, it's certain. If the plan were drafted differently, of course. Yes. Post-retirement. So in this plan, it's a retirement plan. It provides retirement benefits. The purpose is not to provide supplemental income so that a participant can retire and then return to work full-time and double-dip, so to speak. How much money are we talking about, by the way? Your Honor, I don't have that information handy. But it's a monthly annuity paid for the life of the participant. And the Operating Engineers provides a very generous benefit. That amount is in the record. Who funds the plan? The plan is totally funded by contributions that are paid by the employers. It's the contribution rate is set by the bargaining agreements. It's paid on a dollar-per-hour work basis on behalf of the participant. And so in addition to the employer contributions, there are investment earnings. But it's totally funded by the employers. Okay. Consistent with the purpose of the plan being a retirement plan, the plan does provide for the suspension of benefits. And there's a three-pronged test in the plan for defining post-retirement benefits. Benefits are suspended if a participant returns to work for 51 or more hours in a month in post-retirement service. Post-retirement service means in a geographic area of the plan, in an industry in which the contributing employers participate, and in a job classification in which the employee was employed while in covered employment. And the only thing we're disputing or the only thing you're fighting about is job classification. Correct. The trustee and job classification is not defined in the plan, as you pointed out. And so the trustees have the authority under the plan to construe that term. Yeah. On the other hand, job classification has to mean something. I mean, they cannot define job classification in a way that just does total violence to the words. I would agree, Your Honor. And I understand that in the absence of a definition, job classification probably does include, okay, what do you do in the job? And what are the skills that you use in the job? So I'm absolutely with you to that point that this is an appropriate mode of analysis, and I don't think that was challenged, really. The question is whether the analysis here bears up. The skills required for someone who is, let's take Mr. Tapley, he had worked as a heavy duty mechanic, a station mechanic. I gather that's a person who works as a mechanic at a particular outstation, and so he's kind of responsible for the station. He's a fabricator and a welder. Well, all of a sudden, he's a wage-grade 58WG equipment operator with duties as he drives a pickup truck, he operates small tractors and lawnmowers, uses small snowboards to clear the grounds, walkways, and driveways, does simple and routine maintenance with hands and power tools, maintenance, brush cutting, flagging, raking, boy, that sure doesn't sound very much like being a heavy duty mechanic to me. Well, Your Honor, that's why the trustees look to the duties and the skills, and that's why... I'm looking at the duties and the skills. That seems to me that there's not much overlap. Your Honor, they both required an equipment, or a knowledge of equipment functions. They included the reviewing of the, or servicing or checking the equipment for malfunctions. So a cab driver would, if he tried to become a cab driver because it involved a vehicle, that would... This was more than just a cab. These are more than just a cab. If you look at the equipment that was involved, it involved heavy duty equipment, and more than just the common street usage type of equipment. It also involved... When you say it didn't involve, do you mean his earlier job or his current job? Both jobs. Well, he drives a pickup truck, small tractors, and lawnmowers. It wasn't just a pickup truck. There were dump trucks involved as well, and... I'm looking at the job classification that says pickup trucks. Your Honor, if you look at the knowledge that is required, it requires knowledge of vehicles that exceed common street usage. It also requires the ability to work at construction and maintenance type environments. And that's more than just what a cab driver would be required to do. In this case, I think the Wildebor case is helpful. In that case, the participant, as you indicated, returned to work, and only 2% of his duties were similar to what he had done in covered employment. And still the court found that there was enough overlap in just that 2% to find that he was using the same skills that he had used in covered employment. You've also referred to the Smith case, and the Smith case, they never really made a determination in that case. Why, excuse me, why is the Kentucky case instructive if only 2%? You mean why would you look to the court in Kentucky? Yeah, I'm trying just because they decided the issue, and they came up and said 2% overlap was enough? Your Honor, there's very few cases that... It doesn't mean they're right, it just means that on the facts of that case.  It's just persuasive. You, this court... Or not. Or not. This court did rule in the Smith case, however, which also involved a suspension of benefits situation. In that case, it used a definition very similar to the one that is here, and the court did not make a decision in that case. They remanded it for a request to get the job description so that they could compare the skills and duties that were used in the covered employment with the skills and duties that were required in the post-retirement service. So I do think that in that sense, that case is helpful to the court. The job description and this other sort of collateral material, it's part of the mix, but it's hardly determinative, right? What's more important? What he did? I recall, if you'll pardon a personal anecdote, when I was getting admitted to the bar a thousand years ago, and I had to get all this material on all my employers. At age 15, I worked as essentially for Jones Beach. I cleaned up. I had a little thing, and I went around, and I brushed the papers into the thing, and that was my job. I did virtually nothing else. Many years later, I get my job description that Jones Beach Catering sent to me. I was quite impressed by the range of activities, responsibilities, duties, and apparently skills that I had. It had nothing to do with what I did. So why isn't the focus, what did this man do, day in, day out? What does he do now, day in, day out? Isn't that a common sense, reasonable approach? Taking into consideration, all fair, job descriptions, and so master agreements, et cetera, et cetera, but ultimately, what are you doing now? Why did you do that? Something wrong with that? I think that's what the trustees did. They found the overlap in the jobs, and they listed those in their findings and conclusions, and so that is what they did, and I might add that Mr. Tapley only worked at his job for less than 100 hours, so it's hard to find exactly what the actual duties that he did in that job, but the trustees asked for the job description, which presumably describes what was required of them in that job, and there was overlap that they found. The plaintiffs have asked for you to define this in its ordinary and popular sense of the definition, but I might add that they have also conceded that there was no position of flagger or snowplow operator with the state of Alaska, so that also goes to looking at the skills and duties and comparing the skills and duties that were used by the plaintiffs. The district court, in looking to see whether it was an ordinary and popular sense of the term classification, and there is some precedent for that in the Ninth Circuit under the Gilliam case where the court was asked to review a term in the plan. The term was the term earnings, and that was defined, but it was defined as wages and salary, and wages and salary was not defined there, so the court turned to the dictionary for that definition. Let me ask you this. Mr. Tapley now has a job that is characterized, I'm staying away from the word classification for just a moment, characterized by the state of Alaska as a 58WG equipment operator. Now, for purposes of this case and for purposes of the term job classification, is his job classification a 58WG equipment operator, or is it something else? Under the state of Alaska, I would say at least at a minimum that's his job title. I'm asking you under the meaning of the plan now, when I'm asked, well, what is his job classification now, is your position that his job classification is a 58WG equipment operator, or is it something else? My position would be you'd have to look at the skills and duties to see what he actually does. Exactly. So, if he spends most of his time flagging, it doesn't matter that he also could operate a small tractor? No. If he can operate a small tractor, he's operating equipment. He was able to do that. No, I may be sliding my words. You just told me, we look at what he actually does. What if he has never in his new job as a 58WG equipment operator, he has never driven a small tractor? So, I guess we don't count that then. Your Honor, that's not the facts here, but you do have to look at the overlap. Yes, so what did he do in terms of the facts? In his new job? In his new job, he only worked there for less than 100 hours, so it's difficult to know. I know, but what did he do? Well, we would look to the job description to see what was required. No, you just told me we looked at what he did do, and I'm asking you, okay, what did he do? Can you tell me? The trustees look to the job description. But you can't tell me? Other than the job description? Okay. And the trustee's decision has to be, as long as it's reasonable, Your Honor, and it was reasonable for the trustees where somebody has spent less than 100 hours in their job to look at the duties that were required of them for that job and compare them to the duties that they used in covered employment. So if he gets the job specifically, everybody agrees that all he's supposed to do is stand out by the side on the road with one of those fluorescent vests and signal traffic, and that's all he's going to do, and nobody's disputing that that's all he's going to do, whether it's for 100 hours or six months. And then they say, well, that was the position we hired him for, Flagman. That's all we hired him to do. Now, we have a job classification that Flagman fits under. You're saying that the trustees would be reasonable in saying, okay, we're going to ignore all of the evidence about what he actually has been hired to do. We'll look at the job description that goes with this 52-4 mechanic or whatever and say, ah, he potentially could do these other things. You're saying that that would still be a reasonable interpretation on the part of the trustees? I'm saying that's not the facts in this case. Not the facts. No. Because he did more than just flag vehicles. Well, his job description was certainly more than just flagging vehicles. Yes. What I'm saying is he only worked less than 100 hours. So what? I mean, doesn't that define what he's doing? It's only suspending him for the time he's doing something that was covered by what he used to do. And if he's not doing it, are they foreclosed from? He still has to drive to the construction site. He still works within the construction area. He still does a pre-trip inspection and a safety inspection of that equipment, all of which he did when he was in covered employment. And so there's more entailed to the job of flagger than this. Driving to a site is a job skill. And doing safety checks. There's something when he gets there, yes. The safety check. I don't understand driving to a construction site as a special skill. He had to have a commercial driver's license for this position, Your Honor. So that suggests to me that it's more than just a regular street use vehicle. And he had a commercial driver's license when he was working in covered employment. So there was an overlap of some type of equipment operation there. Okay. Okay. Okay, thank you. It counts up. You're over time. Thank you very much. Thank you. Let's hear from the other side. Would you like a minute for rebuttal? Just a little bit. They took testimony from both of these gentlemen. They told them what they were going to do. Mr. Tapley said, I'm going to be a flagman. I went and got a flag license to do that. And we conceded that he would have to tell the trustees if he did any job other than be a flagman. That's all he wanted to do. And the denial was based on that evidence. And Mr. Chapman said he was just driving a snow truck. That's all he was doing. He was driving in the wintertime. And so if they wanted to say, well, you might do this and you might do that, they could have said, okay, you can do this, but you can't do that. But they just said, nope, you can't do anything for the state in this job that you have. In this job that you have, meaning flagging and driving a snow plow. That's right. And the Brown case, I would just like the court to think about that one. That's from this circuit. And in the plan it said for electricians, you can't work, you can't draw retirement and work as a contractor, electrical contractor. And so Mr. Brown went to work for an electrical contractor. He was an employee of electrical contractor, non-union. And the union said, well, you can't do that, similar skills. And this court reversed it and said, that's not what the plan said. If you wanted to say something else, you should have said something else. But being an employee of a contractor is not the same as being a contractor. So this court in the past has said, we want to see what the plan says and apply the language of the plan, not some idea of the language. Okay. Thank you. Thank you both. Tapley versus Locals 302 and 612 submitted for decision.
judges: Dearie, Fletcher, Fisher